UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| MARK GROBER &  EVAN SOLOMON,<br><br>**Plaintiffs,**<br><br>-against-<br><br>EDWARD BRONSON, E-LIONHEART<br>ASSOCIATES LLC AND FAIRHILLS CAPITAL,<br><br>**Defendants.** | 11 Civ.<br><br>__COMPLAINT__<br><br>**ECF Case**<br><br>**Jury Trial Demanded** |

Plaintiffs Mark Grober and Evan Solomon, by their attorneys Hinshaw & Culbertson, for their Complaint against Edward Bronson, e-Lionheart Associates LLC, and Fairhills Capital, allege and state as follows:

## NATURE OF THE ACTION

1.  Defendant Edward Bronson, a licensed attorney in the State of New York, is engaged in a business that involves the solicitation of investment funds, and the investment of those funds and his own funds in securities–related transactions.

2.  In connection with that business, Mr. Bronson has engaged in a pattern of blatantly defrauding the individuals who work for him.  Mark Grober and Evan Solomon worked at Mr. Bronson's firm for more than two years, and performed services that generated revenues of greater than $20 million for Mr. Bronson.  Notwithstanding the enormous profits that were reaped from the services performed by these employees, Mr. Bronson has kept for himself and refused to pay to them more than $2 million in promised compensation and the returns on their reinvestment of that compensation.

3. Mr. Bronson's conduct was similar with respect to both Mr. Grober and Mr. Solomon. Initially, Mr. Bronson offered and paid to them a set amount as a weekly or monthly salary. Once they began generating sizable profits for Mr. Bronson, he offered to these employees (1) a percentage of profits from his business transactions, and (2) the "opportunity" to "roll" their compensation back into the ongoing and highly profitable investment activity. Both Mr. Grober and Mr. Solomon, seeing the substantial returns that the business was generating, agreed to be paid through a percentage of profits, and then left that compensation in the business for investment, withdrawing from the business only relatively small sums during their employment.

4. As long as these employees left their compensation, their investments and their returns on investment in the business, all went well with Mr. Bronson. When they eventually sought to withdraw the amounts that they had earned, and the profits that resulted from the investment of those amounts, Mr. Bronson and his father, Lawrence Bronson, refused to honor Mr. Bronson's agreement, even threatening Mr. Solomon when he pressed to be paid the full amount to which he was entitled.

5. Through these devices, Mr. Bronson managed to gull these employees into working for next to nothing, while they produced literally millions of dollars of profits for Mr. Bronson. Through this action, those employees seek to recover the relatively small amounts that were promised to them.

## PARTIES

6. Plaintiff Mark Grober is an individual who was employed by Mr. Bronson during the period February 2009 through April 2011, and who resides in the City and County of New York.

7. Plaintiff Evan Solomon is an individual who was employed by Mr. Bronson during the period March 2009 through May 2011.

8. Defendant Edward Bronson is an individual who resides at 1275 Fairhills Drive in Ossining, New York, and is a licensed attorney in the State of New York. During all relevant time periods, Mr. Bronson engaged in a business of solicitation of investment funds, and investment of pools of his funds combined with amounts obtained from others.

9. E-Lionheart Associates LLC is an entity formed in Delaware through which Bronson engages in the investment activities at issue, and in which plaintiff's accrued compensation and their returns were invested.

10. Defendant Fairhills Capital is a "doing business as" used by Mr. Bronson to conduct the business activities at issue, including the solicitation of public companies to receive financing in exchange for stock. The web site of that entity lists an address of 245 Main Street, White Plains, New York.

## JURISDICTION & VENUE

11. This Court has subject matter jurisdiction of this action and venue is proper pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§77t(b) and 77v(a)], and Sections 21 and Section 27 of the Exchange Act [15 U.S.C. §§80b-9 and 80b-14].

12. The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, and the mails, in connection with the acts and transactions alleged herein.

A substantial portion of the events at issue occurred in the Southern District of New York, and Fairhills Capital maintain its office in this District.

## BACKGROUND

### Bronson's "Rule 504" Business

13. Throughout the period May 2009 through the present, Edward Bronson has operated a business that engages primarily in the acquisition and sale of stock. During the period May 2010 through at least March 2011, Mr. Bronson's father, Lawrence Bronson, also participated in and directed that business and received profits from it.

14. That business consists of a continuous stream of transactions, all with the same structure and sequence. First, Mr. Bronson had his employees attempt to locate publicly trading companies that were interested in obtaining financing in exchange for a quantity or block of their stock. Mr. Bronson also instructed those employees concerning the criteria that should be used to determine if the company was a suitable prospect for financing, most importantly, the volume of trading and/or liquidity of the company's stock.

15. If a company was found to be a suitable prospect, negotiations would then occur with respect to the terms of the financing that would be provided to the company, most importantly, the quantity of stock that the company was willing to transfer in exchange for financing. As a rule, Mr. Bronson sought to obtain a quantity of stock equal to twice the amount of the financing, based on discounting the stock by 50% from the price at which it was trading,

16. In addition, materials relating to the prospective borrower were forwarded to attorneys employed by Mr. Bronson, primarily Virginia Sourlis, for review regarding compliance with Rule 504. Those attorneys would provide opinion letters confirming that the stock should be issued without restriction.

17. Once an agreement was reached and approved by counsel, Mr. Bronson would receive the stock and the issuer would obtain the financing. Upon receipt of that unrestricted stock, the stock was then sold by Mr. Bronson and individuals acting at his direction.

18. Through that pattern of transactions, with financing provided to small companies in exchange for blocks of stock that were then sold, the business generated enormous profits. During the period May 2009 through March 2011, the business generated more than $20 million in revenues, and incurred expenses consisting only of the financing itself, some compensation to employees, and expenses associated with the sales of stock. In August of 2009, for example, Mr. Bronson earned a profit of roughly $500,000. During September 2009, the firm earned a profit of $1.1 million. Of that amount, Mr. Bronson's profit totalled greater than $750,000. As calculated by Mr. Bronson on or about September 21, 2009, he had earned a total profit of roughly $1 million in only a seven week period. During that same period, Mr. Bronson transferred amounts totalling $345,430 for his acquisitions of an Aston Martin and a Porsche, in addition to another $100,000 in payments directly to him.

19. For the month of October 2009, the gross profits were close to $2 million, net profits increased to a total of almost $1 million, and Mr. Bronson's share – for that month alone – equaled $573,852. As of October 21, 2009, Mr. Bronson had gained profits of greater than $1.4 million for the "Rule 504" business conducted since May.

20. At that point, in October 2009, Mr. Bronson instructed Mr. Grober that he would be taking, in draw alone, $150,000 each month, for an annual total draw of $1.8 million. For the three months of October through December 2009, Mr. Bronson actually directed payments to himself or for his benefit in a greater amount of more than $550,000.

21. During 2010, Mr. Bronson continued to draw substantial amounts each month, directly and as payments relating to his Aston Martin and his Porsche, home improvements, acquisition of a Mercedes Benz, and disbursements to create and fund offshore accounts. Amounts drawn by or for Mr. Bronson, in 2010, totalled more than $2.4 million.

22. During the roughly two month period from January 1, 2011 through March 8, 2011, Mr. Bronson drew additional amounts totalling more than $1 million.

### The Fraud Relating to Mark Grober and Evan Solomon

23. Even as the business was generating literally millions of dollars in profits for Mr. Bronson, he devised a way to drastically reduce the amounts that had to be paid as compensation to the employees, increasing his own profit while also increasing the amount of invested funds available to engage in the financing transactions.

24. With respect to both Mr. Grober and Mr. Solomon, Mr. Bronson at first agreed to pay them a set amount each month as their compensation. Once they had the opportunity to see the extent of the profits generated by the business. Mr. Bronson agreed to pay each of them a percentage of profits generated by the transactions.

25. Mr. Bronson then offered each of them the opportunity to "reinvest" those amounts in the ongoing "Rule 504" and other transactions, claiming that their reinvestment of their compensation was permissible under the applicable rules and regulations, that it would net them substantial profits on their ever increasing amount of investment, and that they would then be able to withdraw and receive both their invested compensation and their returns on those investments. To induce them to "reinvest" their own compensation instead of withdrawing those amounts, Mr. Bronson represented that they would receive a higher percentage of the profits generated by the transactions in which they were invested.

26. On information and belief, Mr. Bronson's representations to Mr. Grober and Mr. Solomon were false when made, and were made with the intent to induce them to invest their funds in the ongoing transactions, providing the business with additional funding and the means for Mr. Bronson to engage in more lucrative Rule 504 transactions.

**Mark Grober**

27. In February 2009, Mr. Bronson hired Mark Grober to work as the Portfolio Manager for his business activities

28. Initially, Mr. Bronson agreed to pay to Mr. Grober a total of $15,000 per month as his compensation. During the period February through April 2009, Mr. Grober worked under that compensation agreement, engaging primarily in issues relating to Ed Bronson's prior business.

29. In or about May of 2009, Mr. Grober began assisting Mr. Bronson with what Mr. Bronson described to him as "Rule 504" transactions. Specifically, Mr. Bronson directed his employees, including Mr. Grober, to locate prospective companies, investigate those companies, and discuss with them the terms of financing.

30. Mr. Bronson also had Mr. Grober and others dealing with attorneys that were hired by Mr. Bronson including Virginia Sourlis. Those attorneys reviewed the transactions and continuously provided opinion letters regarding the *bona fides* of the transactions, and stating that the stock to be received by Mr. Bronson's firm should be issued without restriction.

31. Also, beginning in or about September 2009, Mr. Grober maintained the day to day records of the amounts obtained through the sales of stock, the total profits that the firm made, and the amounts disbursed to Mr. Bronson and others, providing that information to Mr. Bronson as requested.

32. Beginning in or about June 2009, when this "Rule 504" business began to generate profits, and given the fact that Mr. Grober was actually handling so much of the paperwork and logistics associated with the transactions, Mr. Bronson offered and Mr. Grober agreed that Mr. Grober would receive 10% of the profits that were generated through the business.

33. Mr. Bronson also agreed that Mr. Grober would be permitted to "co-invest" with Mr. Bronson in the transactions, and that Mr. Grober would receive 50% of the profits from the transactions in which he co-invested.   Mr. Bronson represented that these investments of compensation were permissible, that the investments would net Mr. Grober substantial profits, and that Mr. Grober would be able to withdraw and receive those amounts.

34. Those representations were false and, upon information and belief, were made with the intent to induce Mr. Grober to continue to perform services while taking only a portion of his compensation and "reinvesting" the bulk of that compensation.

35. During the period July 2009 through Mr. Grober's departure from the firm in April 2011, the business generated revenues of greater than $20 million.

36. During the period July 2009 through April 2011, Mr. Grober continued to oversee the business activities.  He also, throughout that period, was the individual responsible for keeping track of the profits that were being generated and was able to see the extent of those profits.  In the hope of increasing his earnings from that business, he decided to take out of the business only a small portion of his earning, and reinvest the rest.  Through his position, he maintained the accounting of not only Mr. Bronson's share of the profits, but also his own reinvestment of his earnings and the profits to which he was entitled.

37. As of April 2011, the amount that had been earned by Mr. Grober, but reinvested in the business, totalled in excess of $400,000.00.

38. That investment of those funds, which were used to finance the company's ongoing transactions, had earned, in cash and value, more than $1.7 million.

39. Therefore, as of April 2011, Mr. Grober was owed more than $2 million.

### Evan Solomon

40. Mr. Solomon came to work for Mr. Bronson in March 2009, with an agreement that he would be compensated at the rate of $400.00 per week. Mr. Solomon was working primarily as a cold caller, contacting publicly traded companies to locate ones that were interested in receiving financing in exchange for some quantity of their stock.

41. In or about May 2009, Mr. Solomon moved to the Fairhills office in White Plains, New York. His compensation was increased to approximately $1000 per week.

42. In or about August 2009, after Mr. Solomon had demonstrated his willingness and ability to identify prospective borrowers which had then engaged in transactions with Fairhills, Mr. Bronson agreed to pay to Mr. Solomon 4% of net profit of the transactions going forward, and offered to "allow" Mr. Solomon to "roll" that compensation back into the investment activities.

43. As of the end of 2009, Mr. Bronson promoted Mr. Solomon to a manager of the sales activities, overseeing the cold calling activities and the discussions with potential prospects.

44. As of year end 2009, Mr. Solomon was continuing to perform services for Mr. Bronson, continued to assist in the identification of prospects and the closing of transactions, and was advised that he had earned compensation of greater than $127,000.00.

45. Of that $127,000, Mr. Solomon left more than $100,000 in the fund as his investment.

46. In or about February 2010, and as Mr. Solomon continued to contribute to the profits being generated by the business, he discussed again with Mr. Bronson his compensation. Mr.

Bronson agreed at that point that Mr. Solomon would earn 5% of all profits from transactions that were closed by the sales team.

47. Mr. Bronson's representations were false and, upon information and belief, were made with the intent to induce Mr. Solomon to continue to perform services for Mr. Bronson while at the same time leaving the bulk of his compensation in the fund.

48. Based on that agreement, Mr. Solomon continued to perform services for Mr. Bronson.

49. As of the end of 2010, Mr. Solomon's compensation and profits totalled approximately $500,000.00. As of May 2011, the total amount earned by Mr. Solomon totalled greater than $725,000 of which more than $400,000 was still due and owing.

### Lawrence Bronson Joins the Business

50. In or about May 2010, Mr. Bronson's father, Lawrence, was released from federal prison after serving 16 months in a case involving charges of racketeering conspiracy, witness tampering, obstruction of justice and contempt of court. According to the allegations in that case, Larry Bronson and Steven Kaplan, an alleged Gambino associate, engaged in acts of witness intimidation. Bronson was also charged with assisting the Bonanno crime family by hosting meetings that enabled them to meet and discuss organized crime activities in violation of court orders.

51. Almost immediately upon his release from prison, Larry Bronson became actively involved in the day to day activities of Fairhills Capital. Mr. Solomon was asked to and did give up his office so that Larry Bronson could have it, and Larry Bronson was given responsibility for managing the sales team and overseeing the preparation and revision of deal documents.

52. Further, as of Larry Bronson's arrival at the firm, he began to receive a portion of the profits generated by the business.  He received those amounts directly and, in other instances, directed Mr. Grober to wire amounts to an account held in the name of Jill Leidner.

### The Bronsons Refuse to Honor the Agreements

53. In or about November 2010, Mr. Bronson abruptly directed both Mr. Solomon and Mr. Grober to "meet with Larry tomorrow" regarding their employment agreements.  Mr. Solomon was told by Ed Bronson and Larry Bronson that they were refusing to honor the agreement with Mr. Solomon.  Instead of the more than $500,000 that was owed to Mr. Solomon under his agreement, Mr. Bronson told Mr. Solomon that he would pay him a total of $15,000 per month for 9 months.

54. Ed Bronson told Mr. Solomon that he could "take it or leave it."  Mr. Solomon could accept those amounts or, according to Mr. Bronson, leave *via* the office window.

55. Under all the circumstances, Mr. Solomon took Mr. Bronson's threats seriously, and left his office.

56. In early 2011, when Mr. Solomon again raised with Ed Bronson the issues relating to his compensation, Ed Bronson directed Mr. Solomon to speak with Larry Bronson about that issue.

57. Mr. Solomon, who was fully aware of Mr. Bronson's federal conviction and prison sentence, did speak with Larry Bronson but was again told that they would not pay him the actual amount that he was owed.

58. The defendants failed even to pay to Mr. Solomon the lesser amounts that they said they intended to pay, much less the actual amounts of approximately $500,000 that were owed to Mr. Solomon.

59. Since then, Mr. Solomon reiterated his demand for payments of the amount to which he was entitled, and the defendants refused that demand.

60. Given the Bronson's repudiation of the agreement with Mr. Solomon, Mr. Grober also made demand for both his compensation, and the returns on his investment.

61. Defendants failed and refused to pay to Mr. Grober the amounts that he is owed.

### FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

62. Plaintiffs repeat and reallege paragraphs "1" through "61" as if fully set forth herein.

63. Defendant Bronson individually, and through defendants E-Lionheart and Fairhills Capital, carried out a plan, scheme and course of conduct relating to the offer or sale of securities which was intended to and did deceive the plaintiffs as alleged above and enabled defendants to obtain investment funds from the plaintiffs and refuse to pay them either their compensation or return on investment.  In furtherance of this unlawful scheme, plan and course of conduct, each defendant, jointly and individually (a) employed devices, schemes or artifices to defraud;  (b) made untrue statements of material fact and/or omitted to state material  facts necessary to make the statements not misleading, or (c) engaged in acts, practices, and a course of business which operated or would operated as a fraud or deceit upon other persons in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

64. Defendants, individually and jointly, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to provide false information and conceal adverse material information about the securities sold by defendants.

65. Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged above in an effort to persuade the plaintiffs to invest in the securities sold by the defendants, which devices included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts which operated as a fraud and deceit upon the plaintiffs in relation to sales of and as a purchaser of securities from defendants.

66. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.  Defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of obtaining and retaining the plaintiff's compensation and investment monies, and to induce the plaintiffs to transfer funds to the defendants and to maintain those funds with defendants.

67. At the time of these misrepresentations and omissions, the plaintiffs were ignorant of their falsity, and believed them to be true.  Had the plaintiffs known the truth regarding the defendants' intention and decision to retain the investment amounts and the proceeds of the investment activities, and to fail and refuse to pay the amounts promised to the plaintiffs, which defendants did not disclose, the plaintiffs would not have performed services for or invested their funds with Mr. Bronson.

68. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

69. As a direct proximate result of defendant's wrongful conduct, plaintiff Mark Grober has suffered damages in an amount in excess of $2 million.

70. As a direct proximate result of defendant's wrongful conduct, plaintiff Even Solomon has suffered damages in an amount in excess of $400,000.00.

## SECOND CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act)

71. Plaintiffs repeat and reallege paragraphs "1" through "70" as if fully set forth herein.

72. As described above defendants, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly, recklessly or negligently: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

73. The defendants' fraudulent acts and materially false and misleading statements of fact, would have operated and did operate as a fraud or deceit upon the plaintiffs in relation to the purchase and sale of securities, causing damages to plaintiffs in an amount in excess of $2 million.

74. By engaging in the conduct alleged, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### (Breach of Agreement)

75. Plaintiffs repeat and reallege paragraph "1" through "74" as if fully set forth herein.

76. Plaintiffs entered into agreements with Ed Bronson pursuant to which they would perform services for Mr. Bronson in exchange for which Mr. Bronson would pay to defendants certain percentages of the profits generated by the firm's business, and returns on investments of the portion of compensation that they "reinvested."

77. Plaintiffs fully performed their obligations pursuant to that agreement, resulting in profits of greater than $20 million for Mr. Bronson, with millions of dollars actually being drawn by Mr. Bronson as his share of the profit.

78. Since then, plaintiffs have demanded to be paid for those services that they performed and to be paid the returns on those investments.

79. Defendants failed even to respond to plaintiffs' requests and demands for information, and have failed and refused to pay to the plaintiffs the amounts that they are owed.

80. By virtue of the foregoing, defendants have breached the agreement with plaintiffs, and plaintiffs have suffered losses in an amount in excess of $2 million plus interest, attorney's fees and costs.

### FOURTH CLAIM FOR RELIEF

### (Common Law Fraud)

81. Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "80" as if fully set forth herein.

82. Defendant Bronson, to induce Mark Grober and Evan Solomon to perform services for him, made a series of misrepresentations of material facts including claiming that the investment by the plaintiffs was permissible under all applicable rules and regulations, that the plaintiffs would actually be paid the compensation that they invested, and that the plaintiffs would receive and be paid substantial returns on those investments.

83. Defendant Bronson knew, or was reckless in not knowing, that the statements that he made were false.

84. Defendant Bronson engaged in that conduct willfully and deliberately, for the purpose of inducing Mr. Grober and Mr. Solomon to perform services for him, and to "reinvest" their compensation with him.

85. Mr. Grober and Mr. Solomon justifiably relied on the representations of Mr. Bronson, a licensed attorney, in performing service and in deciding to "reinvest" their earning.

86. By virtue of these circumstances, Mr. Grober and Mr. Solomon have suffered damages in an amount in excess of $2 million.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment)

87. Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "86" as if fully set forth herein.

88. Defendants' retention of amounts that were obtained by them through the work performed by the plaintiffs, their retention of the amounts of compensation that these plaintiffs invested, and the retention of the profits that were generated by the investment of those amounts, has unjustly enriched the defendants.

89. Defendants have no basis for refusing to pay to plaintiff and retaining those amounts.

90. These amounts have been demanded but not paid.

91. By virtue of the defendants' conduct, the defendants have been unjustly enriched in an amount in excess of $2 million.

## SIXTH CLAIM FOR RELIEF

### (Promissory Estoppel)

92. Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "91" as if fully set forth herein.

93. The defendants' statements and representations concerning amounts that would be paid to the plaintiffs for the services to be performed by the plaintiffs constituted clear and definite promises.

94. Plaintiffs reasonably relied on Defendants' promises to their detriment by continuing to perform services that generated substantial profits for the business, and by not seeking other employment.

95. Defendants intended that and could reasonably have expected that the plaintiffs would rely on those promises, and would act or refrain from acting based on those promises.

96. Defendants breached those promises by failing to pay plaintiffs the compensation that they promised.

97. As a result of the Defendants' conduct, the plaintiffs have been damaged in an amount in excess of $2 million.

## SEVENTH CLAIM FOR RELIEF

### (Violation of Article 6 of New York Labor Law)

98. Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "97" as if fully set forth herein.

99. Defendants contracted and agreed with plaintiffs that they plaintiffs would receive commission income equal to a percentage of the profits generated by the services that the plaintiff's performed.

100.  Plaintiffs performed the services that entitled them to receive the commission income.

101.  Through the services that he performed, Mr. Grober earned and is owed a total of more than $900,000 in wages.

102.  Through the services that he performed, Mr. Solomon earned and is owed more than $400,000 in wages

103.  Plaintiffs sought and demanded payment of the wages that they had been promised.

104.  Defendants willfully failed and refused to pay the wages that were promised to the plaintiffs.

105.  By virtue of the foregoing, defendants violated Article 6 of New York Labor Law and are liable to the plaintiffs pursuant to Labor Law §§ 191, 193 and 198 for the unpaid wages, liquidated damages on earned commissions, and reasonable attorney's fees, costs and disbursements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief as follows:

For a judgment in Plaintiffs' favor and against Defendants as follows:

A.  On the First Claim against Defendants, compensatory damages, punitive damages, costs and interest, in amounts as yet undetermined but in excess of $2.4 million;

B.  On the Second Claim against Defendants, compensatory damages, punitive damages, costs and interest, in amounts as yet undetermined but in excess of $2 million;

C.  On the Third Claim against Defendants, compensatory damages, punitive damages, costs and interest, in amounts as yet undetermined but in excess of $2 million;

D.  On the Fourth Claim against Defendants, compensatory damages, punitive damages, costs and interest, in amounts as yet undetermined but in excess of $2 million;

E.  On the Fifth Claim against Defendants, compensatory damages, punitive damages, costs and interest, in amounts as yet undetermined but in excess of $2 million;

F.  On the Sixth Claim against Defendants, compensatory damages, punitive damages, costs and interest, in amounts as yet undetermined but in excess of $2 million;

G.  On the Seventh Claim for relief, unpaid wages, liquidated damages, and reasonable attorneys' fees and costs in the amount in excess of $1.300,000.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues triable by a jury as a matter of right.

DATED:  November 8, 2011                    HINSHAW & CULBERTSON LLP


By: Maranda E. Fritz
Maranda E. Fritz  (MEF – 8060)
780 Third Avenue, 4th Floor
New York, New York 10017
Tel: (212) 471-6200
Fax: (212) 935-1166

*Attorneys for Plaintiffs*

130167383v1  0928773130167383v1  0928773

19